Good morning, ladies and gentlemen. Our first case for argument today is Johnson v. C. R. Bard. Mr. Curtis. May it please the Court. Casey Curtis on behalf of appellants C. R. Bard and Bard for rear-fielder vascular. I'd like to reserve five minutes for rebuttal. In terms of my presentation today, I'd like to cover the three grounds that we've raised in our briefing for why we believe a reversal and remand for a new trial is required in this case. The first being Dr. Terse's changed testimony, it was undisclosed, in violations of Rules 26 and 27. The second, the district court's suesponse to reopening of the plaintiff's case in order to allow the treating physician, Dr. Goncharova, to testify. And the third being the district court's decision not to instruct to the jury on the presumption of non-defectiveness that applies under Wisconsin law for compliance with applicable federal or state regulations. Can I ask you a question right off the bat? It seems very strange to me, beyond strange, that Bard did not in any way put before the district court the possibility of a mistrial, you know, clearly stating to the district court that Rule 26 objection that you have. I've looked very carefully at the record citations that you offer for that first point, and I'm very, at one point you say, well, you know, it's not really our fault, so we should be able to raise this now. But we try to make the trial work as well as possible, and I'm very bothered by the fact that Bard didn't really make clear what was going on. The district court sustains quite a few of your objections. They sustained the demonstrative exhibit, sustained the objection about the nondisclosure, and says Hearst can't testify in certain ways. It's a rebuttal. Anyway, so why isn't it your responsibility to squarely put these matters before the district court? And if it's incurable, then say the trial's bad. So with respect to that point, so there's three objections that are stated on the record at the time it happens. The first is a demonstrative comes in or is introduced that was supposed to be pre-cleared. And he says you didn't, and he kind of scolds the plaintiff's lawyer. He says, the plaintiff's lawyer says, oh, I thought I gave it to you last night. The judge says, sorry, you can't use it. He sustains your objection. So to be clear, the district court judge, actually, the first objection says, well, I understand it wasn't pre-cleared, but what's your substantive objection? And the substantive objection that's laid is it's inconsistent with this report, which is the disclosure objection, the same ones that move forward. But why is there never a follow-up sentence? And Rule 26 says that in this situation, the expert can't testify at all. I mean, lots of conversation, I feel, is missing. So to be clear, earlier in the case, a prior expert, Dr. Meeking, similarly testified outside of the report. And there was a discussion earlier about that. And there was a curative instruction that was offered as to that. But I think it's clear from the record that there is clearly objections on disclosure grounds. The objections clearly talk about how this isn't disclosed. It's not proper. And in terms of whether and— But there's no—I mean, you keep using the word clearly, which I have a little bit of trouble with. But the particular objection was to the use of—the first one. There are three objections. The first one is to the use of the demonstrative. The second one is kind of a long sidebar. And it's where you're saying that Hearst is flip-flopping. He's saying that this device migrated downward a very small amount, three millimeters. And now he wants to say it went up a much bigger amount, nearly an inch, two and a half centimeters. So that's not disclosed. And I looked very carefully at document number 311, which is Bard's brief seeking the exclusion of the undisclosed opinions. And this is all in terms of Dr. Hearst as a rebuttal witness. I don't see any request for an instruction to tell the jury to disregard everything Dr. Hearst said. I don't see a motion for a mistrial. I don't see anything. So I agree with you in terms of your discussion of how the brief is framed as Dr. Hearst as a rebuttal witness. But it does discuss the automatic exclusionary sanctions, which is obviously what is at issue, again, in the broader context of the trial. And if you look at when Dr. Stein testifies, our expert— How much of a mind reader is the district court supposed to be? You know, you are raising an objection about a particular point. And it seems you may have had a very good objection about the scope of the amendment of the report, the failure to amend the report. But you didn't really say that. You want the judge to kind of divine it from your motion. Well, the objections that are lodged in those three contemporary moments are very—I won't say clearly because I know you're having trouble with that characterization. They say this is not disclosed. This is inconsistent with this report. And at that point, I'm not sure what else is—we need to say from a perspective of— Well, how about, and so we would like it all excluded, you know, and if you can't give—you would have had to make a strategic decision at that point. Do you just say we need a mistrial? There's no way to erase this from the jury's mind? Because actually I have some other substantive questions about this, but we can stay on the procedural points for a minute. Yeah. So I think at that point in time, because the exclusion is automatic under 26 and 37, it's preserved. That's all that was required of part. So you didn't have to say to the judge, you have to exclude this? I think it's clear from the context of how the objections are laid to him where we say, he can't testify to this. This is improper because it's inconsistent. And he didn't. He blocks him as a rebuttal. He blocks the use of the demonstrative. And he says, you can't say if it went up or down. All you can talk about, you know, is what's in your report. Well, to be clear, that's after the jury already heard all of the statements about it going up. The opposing counsel then uses in closing to say, and this is why there's no problem. And again, I would contrast what happened— But you're not disagreeing that the judge says you can't say whether it went up or down. Counsel has to change his whole examination. So he did say it. He had already said it at that point in time. And the objections lodged. And again, I would just—to the extent you're having a problem with this from a preservation perspective, I would compare and contrast what happens when we laid that objection when the exact same thing happens with our witness, Dr. Stein, on the final day of trial, where the other side says, objection, this isn't in his report. And the judge immediately says, sustained. Jury disregarded that statement. The context is no different. We said the exact same thing. In fact, we said them more vigorously and we said them three separate times. And the difference is, the judge says, and this is quoting from the transcript, we are where we are. I'm not sure what else we're supposed to do at that point. Well, sure. I mean, I'm telling you what you're supposed to do. Can I ask you one other thing? At one point, Dr. Hurst says, none of this matters anyway. And if you look at the problem that Ms. Johnson had with this device, it had nothing to do with it being too high, so blood clots were accumulating, her legs didn't swell up, you know, all these things that are in the record. What happens is the thing breaks apart and a chunk of it winds up in the right atrium of her heart. So I don't know why this up or down business is material at all. So the reason that the up or down business is material is, the theory of the case that was advanced by the other side is that the device has a propensity to migrate caudally, which leads to fracture, which leads to these other complications, including the ones that Ms. Johnson, the plaintiff, had suffered. And the testimony from Hurst and the testimony from our expert, Stein, is both the same, that when you place the device too high, when it's placed at the level of the renal veins, it can't securely attach, because what the device is supposed to do is, the description from the Booker case provides a very helpful one, it's like an umbrella. You put it into the vein, it deploys and it broadens itself out and attaches to the walls of the vena cava. When it's where it's installed in the vena cava at the level of the renal veins, it can't attach because there's, you know, ancillary veins that come in at that point, and so there's not secure attachment, which leads to the same complications. And I think, you know, our point was, and what we made was that that's Dr. Hurst's testimony and acknowledges that that can be a complication or problem of that placement. Our expert says that, and even Dr. Goncharova, when she testifies, makes that same thing. Since we've spent so much time on this particular issue, I'll just move very briefly to the other ones, recognizing that I'm running short on time. In terms of our second point of reversal, you know, we contend that it was error for the District Court to sui sponte, reopen the case, to allow Dr. Goncharova to testify, and that under this Court's precedence in Myers and in the AutoZone case, a treating physician cannot offer testimony beyond that, the opinions, sorry, cannot offer opinion testimony beyond that the opinions formed during the course of care and treatment. And our position is what happened in this case is that Dr. Goncharova's testimonies about warnings, about other things that she was not aware of at the time, are the type of opinion testimony that goes beyond the care and treatment. And then finally, on our final point— —claim of error? I'm sorry, I missed your question. Was that preserved? So there was a—before Dr. Goncharova testified, there was a brief that was submitted saying that she should be limited in that fashion. There were objections lodged. The first objection was on the grounds that when the first hypothetical question is posed to her, the objection that is lodged is that it was beyond her care and treatment. The District Court did not understand what that meant, so there's a sidebar. After that, the attorney at trial changes the phrasing and starts objecting on the grounds of lack of foundation. The other side has said that is not a preservation because the lack of foundation objections are not the same as outside the care and treatment. What we believe, when you read the record in context, when it started with the District Court not understanding the objection and then he changes the phraseology, the objection is nonetheless the same and the substance of it was preserved. So how do you draw the line? This strikes me as one of those things for the District Court's discretion. She is allowed, I would imagine, to explain what factors made her choose the Meridian device. You know, that was vis-a-vis a particular patient, Ms. Johnson. And that decision to use the Meridian device is informed by the warnings that she was aware of. And of course, this whole case is a strict liability failure to warn at this point. Lots of other theories have fallen away. So she necessarily has to be talking about the warnings that she read and saying, gee, if I'd known, she says, if I'd understood its unreasonable risk, she wouldn't have used it. No, I wasn't aware of that. Would that information have been important to you? Absolutely. You know, so she's talking about her treatment of this patient. So I... With this... I mean, you know, there's a general specific line and why isn't that for the district judge to draw? Sure. So I would say this court's precedent draws the line, that the Myers case and the out-of-zone case say opinions formed during the course of care and treatment don't need to provide the disclosure. And again, I would take a step back and say, we're in this position only because, you know, Dr. Gruncher wasn't deposed beforehand. There wasn't a report provided. But you could have deposed her. She was on the witness list, right? We could have deposed her to be... She was on the witness list, right? I believe she was. And there was a trial subpoena issued, which is obviously what led to, you know, the things happening at the 11th hour. But to be clear, at summary judgment and the way we thought this trial was going, the bar thought this case was going to be tried, was on the basis of Dr. Hurst's testimony. So at summary judgment, the plaintiff's position that they didn't need her testimony, that it was unnecessary, that they could prove causation, they could prove the fair little warrant theory solely through expert testimony. So I think when Bard went into this trial, the anticipation was, that was their theory, that was how they're going to present it. They were going to only use experts and not the witness. So I recognize we could have, but I think given the way that the case unfolded and the positions that have been taken at summary judgment, that's not how it played out, I guess, in practice. And just because I only have a couple minutes left, just turn very briefly to the presumption of non-defectiveness under Wisconsin law. You know, the district judge at summary judgment rejected that. The instruction was requested. And, you know, it's our position that, well, it doesn't matter who's... I don't understand why this matters, since your client prevailed before the jury on the design defect issue. So who cares what the instructions were or weren't? So on design defect strict liability, yes. But under Wisconsin law, the instruction applies to both warning strict liability design defect and, sorry, warning strict liability and warning strict liability design defect. So because we lost on the strict liability claim and the instructions applicable to the strict liability claim, even though it is a warning defect claim, you know, we believe it's important that they would have gotten the instruction. With that, because I only have one minute left to roll, and I really do want to save time, if it's all right, I would like to reserve the rest of my time. Certainly, counsel. Mr. Siegel. Thank you, Your Honor. May it please the court. I want to simply hearken to the waiver considerations expressed by Your Honor. Needless to say... But let me say, as you do that, you were playing a very dangerous game. I mean, it's shocking to me that the difference between three millimeters down migration, sort of against the flow of everything, versus two and a half centimeters up was not disclosed. What's an expert report for? Your Honor, we did not dispute that that was a change in opinion. And so you violated the rules. We violated the rules and... And you're extraordinarily lucky that the defense did not move for sanctions, including precluding the whole theory of liability. They didn't do that, Your Honor. Well, we know they didn't do that. I don't dispute that... But what comes across in this case is the plaintiffs deliberately flouted their disclosure obligations in the hope that they would catch the defense sleeping, and they did. But that doesn't put your side in very good light. Your Honor, I don't believe that the lawyers at trial were deliberately sandbagging the defendant. Why didn't they disclose Dr. Hearst's opinion? They acknowledged that they should have. They did. They acknowledged that, Your Honor. And there's no dispute that there was a violation of the rule. We're not here defending on that basis. We are, however, defending on the basis that Your Honor raised at the outset of counsel's argument, which is there were many, many things that the defendants could have done. Short of a mistrial, Your Honor suggested that there was nothing preventing them from immediately moving for a mistrial. But another thing short of that is they could have said, well, we'd like some time to digest this and figure out how to cross-examine Dr. Hearst on it. We cited a case from this court... Did they do that in that trial brief, Docket 311? That, as Judge Wood noticed, that was geared, that was entirely geared toward not allowing Dr. Hearst to come back as a rebuttal witness, which he did not. Right. On page 8 it says, allowing Dr. Hearst to testify to an entirely new opinion in the rebuttal portion of plaintiff's case would also cause a significant disruption to the court. It again repeats, in the rebuttal portion of Bard's case. And then it winds up saying, Dr. Hearst's testimony, as I read it, meaning in the rebuttal portion, regarding his new undisclosed expert opinion must be excluded. And there is no rebuttal, right? There was no rebuttal. So it never comes in, in the rebuttal. That's right. I think the fact of the matter is that, as the court has sensed by its questions, this issue of where the filter was placed and whether it migrated up or down is not a significant issue. And to whatever extent, we're sort of beyond waiver now and talking about harmlessness. But that is worth diverting to for a second, because the jury might well have concluded that it migrated one way or another. We don't know. Or the jury might have accepted Dr. Stein's testimony that it didn't migrate at all. And again, as the court noted, the jury found for the defendant on the issue of design, on both theories of what to do with, is there some inherent design flaw that makes the filter likely to migrate up or down? It doesn't really matter. What the jury found for us on one theory, which was strict liability failure to warn, and that theory had to do with, had there been more warnings about the propensity of this thing to fracture, the treating doctor would not have used it, would have used a waiver. All right. In the discussion with Dr. Goncharova, there's a point where it must be you saying, I'd like you to assume that as of 2007, Bard was aware that the G2 filter platform over a six-month period of time demonstrated migration, total migration of 62%. Was that information you were aware of? And she responds, I did not know that information. And then, would it have been important? She says, yes. Unacceptable risk of migration. So that seems like migration is a topic that's being pursued. But I don't, migration, yes. But the direction of migration. The idea that the filter can move, or break and move, and thereby perhaps get into an organ or someplace it shouldn't be, that was the subject of some discussion. But the change in Dr. Hurst's testimony that they focus on is, originally he said in his report and his deposition that it migrated, again, we're talking about very, very small distances here, down. And at trial, he said, well, now it's migrated up. How is that a typo? Your Honor, I think what happened at trial is that the trial lawyers looked at the report and said, maybe this is a typo, or maybe he misspoke. It's not a typo. 3 millimeters is so different from 2 centimeters that the direction of movement, whether or not that's a typo, 3 millimeters and 2 centimeters are orders of magnitude different. That is true, Your Honor. That is true. But I suggest that it's not our job as appellees to explain why they didn't pursue this. And my guess is that, in fact, it was not a big issue in anyone's mind. What they say is, and this is certainly something that I've heard people say before, was that their concern was if they adopted the cross-examination route, that the jury would just be hearing over and over again about Dr. Hurst's undisclosed opinion, and it might reinforce it in the jury's ears instead of undermine it. Now, you could say Dr. Hurst is incompetent. He doesn't know the difference between up and down. Millimeters and centimeters. Millimeters and centimeters. We all had these little rulers when we were kids that had things marked off. Well, Your Honor, I mean... So, I mean, but you didn't... So they may have had some reason for not wanting the... Of course, we'll never know. If they had asked, or if the district court had said, here's what I'm going to do. I'm going to allow you to cross-examine. I'm going to give a cautionary instruction. I'm going to give another cautionary instruction. Then I would have expected the debate about whether that's enough to cure the prejudice or whether the only thing to do is to throw away the trial. They didn't do any of that. I mean, we cited a case in our brief from this court called Jikla, G-I-C-L-A, 572F3-407, which is a very similar situation in which there was a change in an expert's opinion. And this court said that it focused on the fact that the adverse party could have asked for a break to figure out how to cross-examine the witness. It did not do that. And the court says, we have recognized the propriety of such measures, i.e. cross-examination, to correct Rule 26 violations. They could have done that. So the essence of your argument is that even though Rule 26 is designed to be self-executing, if you don't have an updated report, the testimony is supposed to be excluded. But what you need to say is, on top of that, is still the broader principle of harmless error. That, in fact, with all of these other potential remedies out there, we just have no way of knowing the impact of this. Well, the broader principle of harmless error and the broader principle of preservation of error. I mean, Rule 26 violations are not exempt from the preservation rules. And they just didn't do that. And we have not talked about the fact that the very first time he said this supposedly mind-blowing, case-changing opinion, they didn't object at all. They just didn't. And then the three times they did object, those objections were sustained. So I'm in the position of agreeing that we made a mistake. But it was a mistake easily remediable by them or preservable, and they did not do that. And we insist on the preservation rules, and we insist on the harmless error rules. I would like you to say a few words about the Wisconsin statute and the impact of 510K clearance. Yeah. I think the district judge was entirely correct in rejecting that proposed instruction. As we point out, it so happens that the MDL judge in this case, before this case was remanded back to the trial court in the MDL, the MDL judge actually had another case involving a Wisconsin plaintiff and applied Wisconsin law. And the defendant moved for summary judgments on the basis of this presumption, saying, here's what the presumption says, and the plaintiffs have no evidence to overcome it. And the MDL judge in Arizona looked at that, as have other courts in other medical device cases, and said these kinds of instructions, and specifically in that case, the Wisconsin instruction or the presumption that is the basis of the instruction. Why is what a district judge in Arizona thought pertinent to this appeal? I understood that you were asked a substantive question. We have to decide. We will decide as a legal matter. I was getting to the substantive ruling, Your Honor. So what I want to know is on the substance, is it a problem in your view, is your theory that there's a problem with this record, or is your theory that everything that goes through the Class II 510K process ineligible for the Wisconsin presumption? Both, Your Honor. I mean, the 510K process is focused on equivalence, not safety. I thought it was in the alternative, to be honest. I thought you could either show to be substantially equivalent, the device must have the same intended use as the predicate device, and either have the same technological characteristics or be as safe and effective. That's what this Court said in the Kaiser opinion, looking at these 510K cases. Now, it happened to be Indiana, but it was very similar. It did. This Court did hold that in Kaiser and held that the claim was not preempted in Kaiser. Now, I realize that was a substantive preemption holding, not a holding about an instruction. But the Wisconsin statute gives this presumption if there are relevant standards, if the product complied with relevant standards. What would be the relevant standard in this case? That's what's missing. That's why I'm asking if it's a record-specific problem. If they just didn't put relevant standards or they don't happen to be there for this device, that's one thing. Nobody's saying everything about the entire universe of Class II devices. That's right, Your Honor. Our narrower argument is I guess we're not arguing that 510K clearance for a Class II device can never yield this kind of presumption or instruction. But in this record, it was incumbent upon them to show the district court some relevant standard that would bring it within the terms of the Wisconsin statutory presumption. What is it? We said in our brief they never say what it is. You might ask counsel that on rebuttal. What is the so-called special control, the three special controls that are never actually quoted or identified but sort of alluded to in a footnote in Appellant's brief? I think what they're referring to is controls about sterilization hazards, something called a biocompatibility control. It has nothing to do with any of the issues in this case. The issue in this case or the issue on the theory that we prevailed on was, was there a failure to warn of a hazard? Well, what was the hazard? We were asserting that the hazard was the propensity of the filter to fracture and thereby cause injury. There is no special control that's ever been identified that has anything to do with that theory or anything close to that theory. And I just don't, I don't think it's ever been identified in any of the briefs, and I think that's why all of these other cases, admittedly, they're all district court cases, and of course not binding on this court, but that's why all of these cases involving these presumptions or these requested instructions come out the same way. If the court has any further questions, I'll be happy to answer them. I'm almost out of my time. Thank you. Thank you, Your Honor. Mr. Curtis, anything further? So just a couple of quick points. So first, on the presumption of the defectiveness, the way the district judge decided this was the categorical rule that 510K is not safety and therefore it would never apply. We have identified the specific standards, and what I would direct the court to is the briefing and the regulation that's discussed in Booker. It's 21 CFR 870.3375 that delineates the three special controls for intervascular filters, and to your point, Judge Wood, Kaiser talks about the role that special controls play for Class II devices, and here we have, by FDA regulation and on the FDA's website, the specific special controls that are applicable to the testing, labeling, et cetera. But they're very vague. I looked at these guidance documents, and they really just speak at an extraordinarily high level of generality, like you're supposed to, in your clinical investigation, consider the following items, study design, study hypothesis samples. I mean, this is just glittering generalities, it seems. So the intervascular filter guidance document is written, I think, from a reasonable level of generality, but it has specifics. That's a pretty high level of generality. Well, in fairness, through the administrative process, and we delineated all the rules, FDA said these are the special controls we conclude in our expert judgment are sufficient to provide reasonable assurances of safety and effectiveness. So I do think that there's some level of administrative deference that's out here to what it determines, and then moreover, what I would point to, and this was in the record, is Mr. Van Fleet, when he testifies, specifically walks through how the process works, the role that the intervascular filter guidance documents does, the process of determining tests, what the FDA requires from a labeling perspective, et cetera, and all we're asking for in relation to the presumption was a statement that the jury is entitled to determine whether, sorry, the presumption, and the jury can say it's met or it's not met, but that's where the failure to instruct was, was this categorical ruling, it could never apply, and all we're saying is we were just entitled to a simple presumption. And then just, I know I'm out of time, just very quickly on the preservation point. No, counsel, your time has expired. Okay, thank you. The case is taken under advisement. Thank you.